In the

# United States Court of Appeals

## For the Seventh Circuit

───────────────────

No. 22-2830

NORBERTO TORRES,

*Plaintiff-Appellant,*

*v.*

KENT BROOKMAN and JASON HART,

*Defendants-Appellees.*

───────────────────

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:19-cv-00248 — **Stephen P. McGlynn,** *Judge.*

───────────────────

On Petition for Rehearing En Banc.

DECIDED MARCH 18, 2026

───────────────────

Before BRENNAN, *Chief Judge,* and EASTERBROOK, SCUDDER,
ST. EVE, KIRSCH, JACKSON-AKIWUMI, LEE, PRYOR, KOLAR, and
MALDONADO, *Circuit Judges.*[*]

───────────────────

[*] Circuit Judge Taibleson did not participate in the consideration of
this petition for rehearing en banc.

PER CURIAM. On consideration of the petition for rehearing en banc filed by Plaintiff-Appellant on October 31, 2025, a judge in regular active service called for a vote on the petition for rehearing en banc, and a majority of judges in regular active service voted to deny the petition. Judges Jackson-Akiwumi and Maldonado voted to grant the petition for rehearing en banc.

On the majority vote, the petition for rehearing en banc is DENIED.

No. 22-2830                                                      3

MALDONADO, *Circuit Judge*, joined by ROVNER and
JACKSON-AKIWUMI, *Circuit Judges*, dissenting from the denial
of rehearing *en banc*. The *Torres* majority extends *Adams v. Reagle*, 91 F.4th 880 (7th Cir. 2024), to hold categorically that prisoners facing transfer to disciplinary segregation are entitled
only to informal, non-adversarial due process. *Torres v. Brookman*, 155 F.4th 952, 960 (7th Cir. 2025). The application of this
lenient standard to impose prison punishment conflicts with
Supreme Court precedent, cements a circuit split, and deviates from our decisions affording inmates charged with misconduct the protections set forth in *Wolff v. McDonnell*, 418
U.S. 539, 547, 558 (1974). Therefore, I respectfully dissent from
the denial of rehearing *en banc*.

## I.

I start with Supreme Court precedent as "[w]e are bound
to follow a decision of the Supreme Court." *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987). Not once has the
Supreme Court held that an inmate facing disciplinary segregation is entitled only to informal, non-adversarial due process. Instead, the Supreme Court has allowed such inmates to
receive procedural protections including, to the extent feasible, the right to call witnesses and to present documentary evidence. *See Wolff*, 418 U.S. at 566. Meanwhile, the Supreme
Court has reserved informal, non-adversarial due process for
inmates facing routine administrative transfers—whether to a
higher security prison, administrative segregation, or release
on parole. *See Wilkinson v. Austin*, 545 U.S. 209, 228–29 (2005)
(supermax prison); *Hewitt v. Helms*, 459 U.S. 460, 468 (1983),
*abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472
(1995) (administrative segregation); *Greenholtz v. Inmates of
Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) (parole).

Put differently, cognizant that the requirements of due process are "flexible and call[] for such procedural protections as the particular situation demands," *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972), Supreme Court jurisprudence evinces diverging due process standards where an inmate faces confinement in a disciplinary cell for purported wrongdoing (*Wolff*) and where an inmate faces administrative transfer in the service of larger institutional or penological goals (*Wilkinson*). These two strands of caselaw reflect what the *Torres* majority concedes are the "different aims" of "administrative segregation and disciplinary sanctions." 155 F.4th at 960. Two key reasons justify this divergence.

First, while transfers to disciplinary segregation occur only if an inmate is "guilty of serious misconduct" and thus, carry "the stigma of wrongdoing," administrative transfers occur for "nonpunitive reasons," such as "to protect the prisoner's safety." *Wolff*, 418 U.S. at 558; *Hewitt*, 459 U.S. at 468, 473. Unlike the reprobative or condemnatory character of a transfer to disciplinary segregation, administrative transfers express not censure, but the machinations of prison bureaucracy. Thus, while both sorts of transfers can "involve[] alteration of the conditions of confinement," *Wolff*, 418 U.S. at 547, only the inmate charged with misconduct is placed in those "less amenable and more restrictive quarters," *see Hewitt*, 459 U.S. at 468, specifically as punishment.

Second, the propriety of a transfer to disciplinary segregation turns on the facts underlying allegations of "specific, serious misbehavior," *Wilkinson*, 545 U.S. at 228, and "the determination of whether [misconduct] has occurred becomes critical" as the accused inmate tries to disprove the charges against him, *Wolff*, 418 U.S. at 558. Robust procedural

protections prove useful in this context because the inmate is singled out, his conduct is assessed, and his transfer to disciplinary segregation is conditioned upon the existence, or nonexistence, of particular facts. Administrative transfers, meanwhile, focus less on the details of a specific inmate's conduct while incarcerated and more on factors outside of the inmate's control. Specifically, administrative transfers involve a generalized probe of the institutional environment writ large, "draw[ing] . . . on the experience of prison administrators," *Wilkinson*, 545 U.S. at 228, whose discretionary decisions "depend[] on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals," *Greenholtz*, 442 U.S. at 9–10. In many cases, these decisions "involve no more than informed predictions as to what would best serve institutional security or the safety and welfare of the inmate." *Meachum v. Fano*, 427 U.S. 215, 225 (1976).

The diverging lines of Supreme Court caselaw discussing administrative transfers and transfers to disciplinary segregation suggest that the purpose of the transfer and the focus of the hearing—administrative or disciplinary—dictate the level of due process owed. Intuitively, an inmate facing months of solitary confinement due to allegations of misconduct must receive more procedural protections—specifically, the *Wolff* protections—than an inmate facing transfer to a nearby prison due to overcrowding, who receives only the *Wilkinson* protections.

## II.

Most circuits agree that the *Wolff* standard, not the *Wilkinson* standard, applies to carceral disciplinary proceedings because of the distinct motivations and interests at play in such proceedings. "Bearing in mind the interest in

maintaining a reasonable uniformity of federal law and in sparing the Supreme Court the burden of taking cases merely to resolve conflicts between circuits, we give most respectful consideration to the decisions of the other courts of appeals and follow them whenever we can." *Colby*, 811 F.2d at 1123.

Specifically, in at least six circuits, inmates facing transfer to disciplinary segregation must be provided the ability "to call witnesses and present documentary evidence . . . when permitting [them] to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566; *see Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999) (per curiam) ("[D]ue process requires that in a disciplinary hearing resulting in imposition of . . . solitary confinement, an inmate must be afforded" procedural protections such as the ability "to call witnesses and present documentary evidence."); *Stevenson v. Carroll*, 495 F.3d 62, 70 (3d Cir. 2007) ("[G]reater process [is] accorded to prisoners who are confined for disciplinary infractions than those moved for purely administrative reasons."); *Finley v. Huss*, 102 F.4th 789, 816 (6th Cir. 2024) (distinguishing between the "relatively rigorous procedural safeguards [required] before officials can punish an inmate for serious alleged misconduct" and the "more relaxed procedures" for "administrative or managerial decisions, including non-punitive classification to administrative segregation," and holding that the former requires "an opportunity for the inmate to call witnesses and present exculpatory evidence."); *Walker v. Sumner*, 14 F.3d 1415, 1421 (9th Cir. 1994) (considering what process was due to an inmate sentenced to disciplinary segregation and holding that because "prison officials provide[d] no explanation for the denial of the [inmate's] request for the witness," there was a "genuine issue of material fact that [the inmate] was denied the right to

produce witnesses in his defense."); *Ramer v. Kerby*, 936 F.2d 1102, 1104 (10th Cir. 1991) (quoting *Wolff*, 418 U.S. at 566) (holding in case where inmate faced disciplinary hearing after a physical altercation with a guard, that "a prisoner in a disciplinary hearing must have the opportunity 'to call witnesses and present documentary evidence in his defense, when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals.'"); *Jacoby v. Baldwin Cnty.*, 835 F.3d 1338, 1350 (11th Cir. 2016) ("The [ ] jail provided [the inmate] with a hearing before placing him in disciplinary segregation, so the question before us is whether it was clearly established that the hearing violated *Wolff*.").

Our creation of a circuit split has real consequences because "it is neither unreasonable nor unusual for an inmate to serve practically his entire sentence in a State other than the one in which he was convicted." *Olim v. Wakinekona*, 461 U.S. 238, 247 (1983). To address overcrowding issues, and for other administrative reasons, "states may trade prisoners . . . when they wish," and some states outsource significant percentages of their prison population to other states. Emma Kaufman, *The Prisoner Trade*, 133 HARV. L. REV. 1815, 1818 (2020). For example, "Vermont outsources a sixth of its prison population, and Hawaii houses close to half of its prisoners on the mainland." *Id.* A system where inmates incarcerated in some parts of the country may call witnesses and present documentary evidence when facing disciplinary segregation, but inmates in other parts of the country may not, is unwise where inmates may be moved across circuits at any time.

## III.

Until recently, our own precedent has also suggested that the heightened level of due process provided for under *Wolff*

applies to transfers to disciplinary segregation. *See, e.g.*, *Lisle v. Welborn*, 933 F.3d 705, 720–21 (7th Cir. 2019); *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009); *Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003). In 2023, we held that "[i]t is well-settled that due process in a prison disciplinary hearing requires advance notice of the charges, a hearing before an impartial decisionmaker, the right to call witnesses and present evidence (when consistent with institutional safety), and a written explanation of the outcome." *Prude v. Meli*, 76 F.4th 648, 657 (7th Cir. 2023).

This changed when the *Adams* majority declared that "[o]ur law is clear that an inmate who is facing transfer to disciplinary segregation is entitled *only* to 'informal, nonadversarial due process,' which 'leave[s] substantial discretion and flexibility in the hands of the prison administrators.'" 91 F.4th at 895 (emphasis added) (quoting *Westefer v. Neal*, 682 F.3d 679, 684–85 (7th Cir. 2012)); *see also Ealy v. Watson*, 109 F.4th 958, 965 (7th Cir. 2024) ("[T]his court's recent decision in *Adams v. Reagle* crystallized the process owed to inmates facing only disciplinary action like segregation.").

But as Judge Hamilton has observed, "the *Adams* panel did not address the Supreme Court's different teaching in *Wolff* and *Sandin*. Nor did it engage with our other precedents . . . indicating that the more formal *Wolff* procedures would apply to cases of individual punishment with prolonged solitary confinement." *Jackson v. Anastasio*, 150 F.4th 851, 866 (7th Cir. 2025) (Hamilton, J., concurring). Indeed, the sole support provided by *Adams* for the proposition that an inmate facing disciplinary segregation is entitled only to informal, non-adversarial due process was our holding in *Westefer*, which dealt exclusively with the procedural protections owed to inmates

facing administrative transfer. *See* 682 F.3d at 684 ("Inmates transferred to a supermax prison are entitled to informal, non-adversarial due process.").

## IV.

Cementing the change initiated by *Adams*, *Torres* elides the distinctions between administrative transfers and transfers to disciplinary segregation in pursuit of a clear, universal rule. 155 F.4th at 960. But in so doing, *Torres* extends *Wilkinson*'s lesser procedural protections—mere notice and an opportunity to be heard, *see* 545 U.S. at 229—to apply in any context where an inmate is transferred within the prison or among prisons, even where that transfer is ordered as punishment. As the *Torres* majority has it, an inmate is only entitled to *Wolff* protections where he risks losing good-time credits, not where he faces months or years of solitary confinement.

*Wolff* provides no basis to cabin its protections to this narrow group of inmates. In *Wolff*, the Supreme Court explicitly treated the loss of good-time credits as equivalent, for the purposes of procedural protections, to disciplinary segregation. First, the Supreme Court noted that prison punishment came in two categories, one of which, the "withholding of good-time credits," "affects the *term* of confinement," while the other, "confinement in a disciplinary cell, involves alteration of the *conditions* of confinement." *Wolff*, 418 U.S. at 547 (emphasis added). In *Wolff*, the complaint at issue solely sought restoration of good-time credits, so the court focused its attention there. *Id.* at 554. But such focus cannot be read to mean that *Wolff*'s procedural protections were intended to apply only to an inmate facing that specific punishment. As the Supreme Court observed:

> The deprivation of good time and imposition of 'solitary' confinement are reserved for instances where serious misbehavior has occurred. This appears a realistic approach, for it would be difficult for the purposes of procedural due process to distinguish between the procedures that are required where good time is forfeited and those that must be extended when solitary confinement is at issue. The latter represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct. Here, as in the case of good time, there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction.

*Id.* at 571 n.19. And in *Sandin*, the Supreme Court added that an inmate's transfer to disciplinary segregation does not implicate a liberty interest unless it subjects the inmate to "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." 515 U.S. at 484.

Together, *Wolff* and *Sandin* emphasize that some forms of disciplinary segregation may result in prison conditions so severe or so different from ordinary conditions of confinement that state authorities may not impose them "without complying with minimum requirements of due process." *Vitek v. Jones*, 445 U.S. 480, 491–94 (1980); *see also Washington v. Harper*, 494 U.S. 210, 221–22 (1990). It is therefore a misreading of Supreme Court precedent to suggest that *Wolff*'s more robust procedural protections apply only where an inmate faces the

loss of good-time credits. One can imagine that some inmates might prefer the loss of three months' worth of credits over spending three months in putrid conditions in disciplinary confinement. We cannot overlook *Wolff*'s teaching that the quantitative and qualitative features of a proposed sanction must be considered to determine the appropriate amount of process due. 418 U.S. at 561.

## V.

The *Torres* majority's decision to categorically preclude inmates facing disciplinary segregation from receiving *Wolff*'s procedural protections undermines the integrity of the prison disciplinary process. Without the right—subject to reasonable limitations—to "call witnesses and present documentary evidence, an accused inmate is not guaranteed the right to present any defense beyond his own word," a concerning prospect because the inmate "obviously faces a severe credibility problem when trying to disprove the charges of a prison guard." *Wolff*, 418 U.S. at 581–83 (Marshall, J., concurring in part and dissenting in part). "The hearing will thus amount to little more than a swearing contest, with each side telling its version of the facts—and, indeed, with only the prisoner's story subject to being tested by cross-examination. In such a contest, it seems obvious to me that even the wrongfully charged inmate will invariably be the loser." *Id.* at 582.

The consequences of such procedurally deficient disciplinary hearings are dramatic. Rather than a slap on the wrist, "[p]risoners are sometimes placed in solitary or punitive segregation for months or even years . . . and such confinement inevitably results in depriving the prisoner of [ ] privileges . . . which are ordinarily available to the general prison population," as well as adversely affecting his eligibility for parole.

*Id.* at 594–95 (Douglas, J., concurring in part and dissenting in part); *Sandin*, 515 U.S. at 488–89 (Ginsburg, J., dissenting) ("Disciplinary confinement as punishment for 'high misconduct' not only deprives prisoners of privileges for protracted periods; unlike administrative segregation and protective custody, disciplinary confinement also stigmatizes them and diminishes parole prospects.").

One need look no further than the case of Norberto Torres to see the sordid effects of a process-deficient prison disciplinary hearing. After he was prohibited from calling a witness or seeing the evidence against him, handicapping his ability to persuasively contest his alleged membership in a prison gang, Torres was transferred to disciplinary segregation in hideous conditions for three months. These conditions were far worse than those experienced by inmates in the general population. For Torres's first four days in confinement, he did not have a bed to sleep on. The toilet in his cell leaked, and each time it was flushed, it spewed sewage water onto the floor, attracting mold, mildew, and insects. Torres asked for cleaning supplies to clean the cell himself, but prison officials never provided them.

The conditions of Torres's disciplinary segregation were both "qualitatively and quantitatively different," *Wolff*, 418 U.S. at 561, from the disciplinary segregation discussed in *Sandin*, which lasted just 30 days and which "mirrored those conditions imposed upon inmates in administrative segregation and protective custody," 515 U.S. at 486. *Cf. Jacoby*, 835 F.3d at 1342, 1349 (distinguishing *Sandin* and holding that pretrial detainee who "was forced to sleep on the floor next to a toilet while in administrative segregation and was exposed to human excrement as a result" "was entitled to the due

process protections enshrined in *Wolff* before being placed in disciplinary segregation.").

The adverse effects of such confinement are manifold. In addition to whatever health risks Torres faced after months of exposure to raw sewage, mold, mildew, rust, and insects, confinement in punitive segregation routinely results in negative psychological consequences. *See Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring). Further, as this court has explained, a judge who thinks that just a few months' incarceration in segregation is negligible "may be unfamiliar with the nature of modern prison segregation and the psychological damage that it can inflict. Segregation isn't just separating a prisoner from one or several other prisoners . . . The serious psychological consequences of such quasi-solitary imprisonment have been documented." *Kervin v. Barnes*, 787 F.3d 833, 837 (7th Cir. 2015) (citing Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement is Cruel and Far Too Usual Punishment*, 90 IND. L. J. 741 (2015); Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J. OF L. & POLICY 325 (2006); Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. REV. OF L. & SOC. CHANGE 477 (1997)).

While most disciplinary segregation will cause a "change in the conditions of confinement having a substantial adverse impact on the prisoner involved," *Meachum*, 427 U.S. at 224, we must draw the line where those changed conditions pose serious health risks to the inmate. We need not agonize over precisely what combination of duration and conditions cause such a health risk to acknowledge that spending 23 hours a day for three months in a cell with raw sewage leaking on the floor is dangerous, unsanitary, and degrading. Subjection to

such conditions is inappropriate under any circumstances, but especially where, as here, the inmate had no access "to the procedural tools essential to the presentation of any meaningful defense" at his disciplinary hearing. *Wolff*, 418 U.S. at 581 (Marshall, J., concurring in part and dissenting in part).[1]

## VI.

"There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff*, 418 U.S. at 555–56. As then-Judge Stevens wrote while on this court, "liberty protected by the due process clause may—indeed must to some extent—coexist with legal custody pursuant to conviction. The deprivation of liberty following an adjudication of guilt is partial, not total. A residuum of constitutionally protected rights remains." *United States ex rel. Miller v. Twomey*, 479 F.2d

---

[1] It is worth observing that the conditions faced by Torres are out of step with international norms for the humane treatment of prisoners. *See Jackson*, 150 F.4th at 864 (Hamilton, J., concurring) (noting that the United Nations' Standard Minimum Rules for the Treatment of Prisoners provide far more strenuous protections to prisoners than federal courts applying the Eighth and Fourteenth Amendments, insofar as just fifteen *days* of solitary confinement is viewed as a form of torture). Though not "a source of justiciable rights," *Serra v. Lappin*, 600 F.3d 1191, 1197 (9th Cir. 2010), three of the Standard Minimum Rules are particularly salient here: Rule 15, which provides for adequate sanitary installations; Rule 17, which provides that cells be "properly maintained and kept scrupulously clean at all times"; and Rule 43, which provides that "[i]n no circumstances may restrictions or disciplinary sanctions amount to torture or other cruel, inhuman or degrading treatment or punishment," and specifically prohibiting "indefinite solitary confinement" and "prolonged solitary confinement." United Nations, Standard Minimum Rules for the Treatment of Prisoners (2015) [https://perma.cc/DNY4-TGJP] (unanimously adopted by the United Nations General Assembly in 2015).

701, 712 (7th Cir. 1973). The Supreme Court, at least six other circuits, and our own precedent have acknowledged that before an inmate is punished with disciplinary confinement, he is entitled to the procedural protections set forth in *Wolff*, including, to the extent feasible, the right to call witnesses and examine the evidence against him. *Torres*'s extension of *Adams*'s holding that an inmate facing transfer to disciplinary segregation is entitled only to the informal, non-adversarial due process set forth in *Wilkinson* warrants rehearing *en banc*.